IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Carlton Averill,                                            Case No. 3:06CV2867

       Plaintiff,

   v.                                                        ORDER

Gleaner Life Insurance Society, et. al.,

       Defendants.

This case is a dispute over retirement benefits. Plaintiff, Carlton Averill, formerly an insurance agent for Gleaner Life Insurance Society – a Michigan-based fraternal benefit society[1] providing financial protection, fraternal benefits and volunteer opportunities to its certificate holders ("Members"), alleges that he was denied benefits he had accrued while selling insurance for Gleaner and, after complaining, wrongfully discharged. Averill specifically alleges violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. (ERISA), age discrimination in violation of O.R.C. § 4112.02(A) and (N) and various state law contract and employment claims. Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332.

---

[1]

Gleaner also refers to itself as a "fraternal beneficiary society", a term used interchangeably with fraternal benefit society. "Fraternal beneficiary society" is the term used under § 501(c)(8) of the Internal Revenue Code – that exempts Gleaner from federal taxes – and in the Michigan Insurance Code. See M.C.L. § 500.8161(h). For purposes of simplicity, "fraternal benefit society" will be used throughout this brief.

Pending are Gleaner's motions for summary judgment with regards to each of Averill's claims and to strike Averill's sur-reply. For the reasons that follow, Gleaner's motion for summary judgement is granted, in part, and denied, in part, and Gleaner's motion to strike is denied as moot.[2]

## Background

Averill, a licensed insurance agent in Ohio and Michigan, is the owner and operator of Cap. Averill, II & Associates, Inc. (CAA) – an independent insurance agency. CAA managed its own office, hired its own employees and set its hours. Averill began selling insurance on behalf of Gleaner in 1985 and did so until his termination in January, 2007.

Averill alleges that before signing these agreements Gleaner gave each agent the choice to become either a "W-2 employee" of Gleaner or a "1099 independent contractor." Gleaner compensated independent contractors separately from their commissions for health care, office expenses, advertising, social security taxes and participation in the Gleaner Retirement Program (a qualified retirement plan).[3]

Averill agreed to sell insurance as an independent contractor, held himself out as such to customers and was responsible for his own withholding of taxes and social security contributions.

---

[2]

Even considering the arguments presented in Averill's sur-reply brief, I find that he has not demonstrated that he has standing to assert an ERISA claim. Accordingly, because consideration of the brief has had no effect on the ultimate resolution of the case, I find the motion to strike is moot. *Joostberns v. United Parcel Servs., Inc.*, 166 Fed. Appx. 783, 798 (2006). ("In light of plaintiff's failure to meet his burden of production even with the Frost Affidavit, [d]efendant's motion to strike is moot.").

[3]

Only a portion of the independent contractors were given the opportunity to enroll in the retirement program. These agents joined the company before 1988 and maintained "W-2 status." Gleaner developed the supplemental program at issue in this case for other insurance agents who did not qualify for the aforementioned category.

Signifying his decision to be an independent contractor, he signed the Special Representative Agreement (SRA) governing the parties' relationship.[4] The SRA contains three clauses relevant to this case. Article 12 of the SRA specifically provides:

> Nothing contained herein shall be construed to create the relationship of employee and employer between the Special Representative [Averill] and the Society. The Special Representative is free to exercise his independent judgment as to the time, place and means for soliciting insurance, but the Special Representative shall abide by the laws of the Society, the rules and regulations and instructions of its regularly constituted authorities which may be prescribed from time to time; however[,] such rules shall not interfere with the freedom of the Special Representative's action or judgment. The Special Representative shall, nonetheless, observe, comply and conform with all laws and Insurance Department rulings and regulations.

[Doc. 46, Art. 12]

Regarding the agreement's validity, the contract provides:

> This agreement supersedes, and is in lieu of, any and all previous agreements between the parties hereto, except all obligations to the Society heretofore incurred by the Special Representative, and his right to commission (if any) under previous agreements shall remain in full force and effect until fully performed. . . . The agreement [however] may be terminated by either party, with or without cause, by giving ten days written notice to the other party, addressed to the last known address of such party. . .

[Doc. 46, Art.'s 2 & 10].

In 2004, Averill additionally agreed to work as a General Agent on behalf of Gleaner. The General Agent Agreement [GAA], in addition to addressing some of the same points, as the SRA, sets out the appropriate commission structure. The Agreement specifically provides that the "General Provisions of the [SRA] apply equally to the General Agent, except as specifically stated therein." [Doc. 46, Art. I.].

---

[4]

On February 1, 2004, concurrent with his agreement to the General Agent Agreement (GAA), Averill again agreed to and signed the SRA. The 2004 version of the SRA duplicated the version Averill signed in 1985.

Averill alleges that, in addition to signing the SRA and GAA, insurance agents choosing to sell insurance as independent contractors understood they were not to sell competing products. Averill alleges that most insurance agents accepted this arrangement because of the potential benefits and marketing advantages it offered. Agents could at once garner the benefits available to employees, but also could sell insurance services that Gleaner did not offer.

If an agent, however, Averill alleges, were to act as a truly independent agent by selling competing varieties of services Gleaner offered, Gleaner would react by eliminating "office-expense support," "office discretionary support" [a social security bonus], health care coverage or support and advertising spots. Averill alleges that on one occasion when he began to sell competing products Gleaner took such actions against him. Once he stopped selling such products, Gleaner restored those benefits.[5] Memorandum from Gleaner to Averill confirm that the receipt of benefits was directly tied to amount of Gleaner's services Averill sold.

Gleaner also disputes plaintiff's characterization of office and expense support as "benefits." It describes the benefits as nothing more than incentives commonly used throughout the sales industry to "incent" insurance agents to sell additional coverage and services.[6] Regardless, both

---

[5]

Averill points out that Michael Wade, Gleaner's former President, frequently referred in his deposition to the status of insurance agents as employees. Wade explained that: accrued benefits increased as "employment continues;" Gleaner remained vested in the "accrued benefit attributable to employer contributions." In addition, Wade discussed the value of Averill's "mandatory employee contributions." [Doc. 35].

[6]

From the deposition of Wade:
Q. Okay. Is this a year-end bonus [referring to office expenses]?
A: No. I wouldn't – the office benefit and expense or office expense and benefit allowance is not a bonus. In fact, I have a difficult time with that term in that the rewards that we put out for independent agents, whether they are termed or characterized as bonuses, they are indeed rewards. They're designed to provide motivation and to incent agents to hit a particular level.

parties admit that the social security bonus approximated the amount of payroll tax each agent owed the Internal Revenue Service for its employees.

In 1988, Gleaner established the Gleaner Supplemental Savings Program (GSSP). Gleaner initially established the GSPP as a tax-exempt retirement benefits plan for its employees pursuant to § 457(e)(12) of the Internal Revenue Code. That provision excludes employer contributions to non-elective deferred compensation plans from taxation if the plan includes, without individual variation, all individuals with equal relationships to the payor. With regards to the GSSP's termination and/or modification, the GSSP agreement provided:

> The Board of Directors reserves the right to modify or to amend, in whole or in part, or to terminate, this Program at any time. However, no modification, amendment or termination of the Program shall adversely affect the right of any Member to receive the benefits created under the Program by the Board of Directors with respect to such Member.

[Pl.'s Exh.'s 3-5, Art. 4].

The GSSP also included a choice of law provision providing that the "Plan shall be construed, regulated, and administered under the laws of the state of Michigan." [Pl.'s Exh.'s 3-5, Art. 5.07].

Regarding the plan's funding and distribution, the plan specifically provided:

Supplemental benefits shall be payable by the society only from its general assets.

---

Q. So we have office support and then we have discretionary office expense and benefit. Were there other payments, again, non-commissioned?
A. There might have been other payments to any of our independent agents, because again, within the profession of field management, you're constantly trying to come up with rewards and incentives and ways in which to differentiate yourself from other carriers, but primarily to incent independent agents to write your product as opposed to someone else's product. . . [T]here are a lot of names, a lot of terms, there were contests, six-month contests, annual contests that might result in cash or prizes of a non-cash nature all designed to incent the independent agent, including Mr. Averill, II, to write our product. [Doc. 35].

The society shall not set aside or segregate assets to fund this plan. . . . In addition, membership in the plan shall not be construed as conferring any right to Society assets, since the plan is not funded.

[Pl.'s Exh.'s 3-5, Art. 3.09 & 5.01].

Participants in the program received annual statements detailing their contributions and accrued benefits and estimating the monthly payment after their death.[7] The statement included a disclaimer:

THIS SUMMARY IS AN ESTIMATE OF YOUR BENEFIT IN YOUR RETIREMENT PLAN AND DOES NOT CREATE OBLIGATIONS OR RIGHTS WHICH WOULD NOT OTHERWISE EXIST. TO THE EXTENT THAT ANY OF THE FURNISHED INFORMATION IS INCORRECT OR THAT ACTUAL EVENTS DIFFER FROM THE ASSUMPTIONS MADE, YOUR ACTUAL BENEFITS MAY VARY FROM THE ESTIMATED BENEFITS SHOWN ON THIS STATEMENT. QUESTIONS REGARDING HOW YOUR BENEFITS WILL BE CALCULATED MAY BE ANSWERED BY CONSULTING YOUR ADMINISTRATOR.

[Pl.'s Exh.'s 13-15].

In 2005, Gleaner, after conducting a review of the GSSP, concluded based on the limited legal precedent interpreting § 457 and discussions with representatives of the Internal Revenue Service, that there was a significant risk that the IRS would conclude that the GSSP was not covered by § 457 and, accordingly, its beneficiaries owe taxes on any accrued benefits, plus additional penalties and interest. Averill alleges that Gleaner, rather than being motivated by an internal assessment, had failed to set aside the "matching funds" it was allegedly required to.

Gleaner shortly thereafter terminated the program, and distributed to each beneficiary a

---

[7]

The specific categories were: 1) "estimated monthly pension at normal retirement;" 2) "estimated amount of benefit which you have accrued to date from the plan;" and 3) "you are vested in 100% of the accrued benefit attributable to employer contributions and you are 100% vested in the accrued benefit attributable to your own contributions . . . [t]herefore your vested account benefit is . . ."

portion of the accrued benefits. Averill, who had contributed $47,182.91, received a payment of $68,140.97. In addition, Gleaner offered a supplemental payment of approximately $60,000 in exchange for the release of any claims they may have against Gleaner. Averill rejected the supplemental payment. He further maintains that both payments were not in fact made from the GSSP, but rather, were distributed from Gleaner's "general fund."

Gleaner alleges that in recent years the relationship between the parties deteriorated. Averill "increasingly sent letters, e-mailed  messages and other communications to Gleaner, its Directors, other agents, and the public, finding fault with Gleaner's management and criticizing business decisions made by Gleaner and its Directors." [Doc. 27]. In addition, Gleaner alleges that Averill has repeatedly, in its dealings with other agents, disseminated false information implying that Gleaner is experiencing financial difficulties.

Gleaner subsequently terminated Averill's authority, along with that of approximately 180 other agents, to sell Gleaner life insurance. Averill alleges that each of the terminated agents was over the age of forty. Averill further alleges that prior to their termination, Gleaner had instituted a program aimed at recruiting college graduates. In addition, after firing its ex-agents, Gleaner sent out distributions to Gleaner members introducing them to their new agents.

Gleaner, on the contrary, alleges that it terminated its relationship with Averill and the other agents after a comprehensive review of all of Gleaner's agents. On finding that over 1,000 agents had authority to sell coverage for Gleaner, Gleaner concluded that it was over-represented. After a five factor review of each agent, Gleaner determined which agents to release. According to Michael Wade, former President of Gleaner, these five factors were: production level, geographic location, cultural fit in the context of the behavioral benefit society, and certain behavioral characteristics

7

such as their responsiveness to customers and their needs.

Gleaner terminated Averill who claims his firing and Gleaner's handling of the GSSP were unlawful. He seeks compensatory and punitive damages in excess of $750,000.

Averill alleges multiple bases for relief, namely that:1) Gleaner's termination of the GSSP violated ERISA; 2) Gleaner's termination of his agency relationship with Gleaner violated Ohio law prohibiting age discrimination; 3) the termination constituted wrongful discharge of employment and agency; 4) the termination constituted bad faith termination of franchise; 5) Gleaner's letters to customers Averill previously served prior to his termination informing them that new insurance agents would serve them constituted tortious interference with existing business relationships; 6) termination of the GSSP constituted a breach of contract; 7) termination of the GSSP breached multiple promises previously made and, therefore, was actionable on the basis of promissory estoppel; 8) Gleaner's failure to maintain the plan, prior to its termination, constituted fraud; and 9) failure to maintain the GSSP, prior to its termination, constituted a breach of fiduciary duty.

### Standard of Review

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

8

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of concrete evidentiary material in support of its position. *Celotex*, *supra,* 477 U.S. at 324.

In deciding the motion for summary judgment, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the non-moving party, all evidence will be construed in the light most favorable to the non-moving party, and all inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Servs.*, Inc., 504 U.S. 451, 456 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material facts and that the moving party is entitled to summary judgment as a matter of law.[8]

### Discussion

### 1. ERISA

Gleaner, in its motion to dismiss, disputes that Averill was an employee of Gleaner for

---

[8]
Despite the parties' failure to address such in their briefs, it is important that I note that different bodies of law govern the various claims. Federal common law governs Averill's ERISA claim. Ohio common law governs Averill's claims for age discrimination. Averill's claims for wrongful termination of employment is a state law claim over which I have jurisdiction under 28 U.S.C. § 1332. Accordingly, I shall apply the substantive law of the state in which this court sits – Ohio. Michigan law governs Averill's claim for bad faith termination of franchise as it arises under a Michigan statute. Finally, Michigan law governs Averill's claims for promissory estoppel, breach of contract, fraud, and breach of fiduciary relationship, because they arise out of the GSSP and are covered by the "choice of law" clause contained in the GSSP.

ERISA purposes and, therefore, cannot benefit from ERISA's protections which are available only to employees.[9] Determination of whether a plaintiff qualifies as an employee under the Act "is a mixed question of law and fact that a judge can normally make as a matter of law." *Lilley v. BTM Corp.*, 958 F.2d 746, 750 n.1 (6th Cir. 1992). Unfortunately, ERISA's nominal definition of employee is circular and the statute has no provision that either gives guidance to the term's meaning or indicating whether incorporating traditional agency law principles would thwart congressional design or lead to absurd results. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992); *see* 29 U.S.C. § 1002(6) (defining employee as "any individual employed by an employer"). For this reason, the Supreme Court has "adopted a common law test for determining who qualifies as an employee under ERISA". *Id.* This is a general common law test of agency, rather than the law of any particular state. *Id.* at 324 (citing *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989)).

The crux of the common law agency test is "the hiring party's right to control the manner and means by which the product is accomplished." *Darden*, *supra,* 503 U.S. at 323. The common law test contains "no shorthand formula or magic phrase that can be applied to find the answer. . . all of the incidents of the relationship must be assessed and weighed . . . ." *Id*. at 324. The Supreme Court has set forth the following factors, none of which is determinative:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired

---

[9]

Averill's claim for benefits arises under 29 U.S.C. § 1132(a), which enables a benefit plan participant to enforce ERISA's substantive provisions. The Act elsewhere defines "participant" as "any employee or former employee of an employer . . . Who is or may become eligible to receive a benefit of any type from an employee benefit plan. . . ." *Id.* at § 1002(7).

party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Reid*, *supra,* 490 U.S. at 751.

That said, the Sixth Circuit has repeatedly held that insurance agents are independent contractors, rather than employees, in the ERISA and many other contexts. *See, e.g.*, *Ware v. United States*, 67 F.3d 574 (6th Cir. 1995) (holding that insurance agent was an independent contractor for tax purposes); *Wolcott v. Nationwide Mut. Ins. Co.*, 884 F.2d 245 (6th Cir. 1989) (finding that insurance agent was an independent contractor under ERISA); *Plazzo v. Nationwide Mut. Ins. Co.*, 1989 WL 154816 (6th Cir. 1989) (unpublished decision) (same). Other courts are in accord with this view. *See, e.g.*, *Butts v. Comm'r of Internal Revenue*, 49 F.3d 713 (11th Cir. 1995) (determining that insurance agents were independent contractors for tax purposes); *Oestman v. Nat'l Farmers Union Ins.*, 958 F.2d 303 (10th Cir. 1992) (holding that insurance agent was an independent contractor under the Age Discrimination in Employment Act).

This case is similar to those cases. Multiple pieces of evidence demonstrate the parties' perception of their relationship. First, the SRA explicitly cautions against finding that the relationship between the parties was that of an employer and employee.  As, the Sixth Circuit has noted, "this evidence, while not dispositive of the issue, is certainly relevant to the inquiry." *Weary v. Cochran*, 377 F.3d 522, 525 (6th Cir. 2004) (citing *Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 218 (6th Cir. 1992) (emphasizing that a cosmetic salesperson's agency agreement "unambiguously declared [her] to be an independent contractor")); *Wolcott*, *supra,* 884 F.2d at 251 (noting the significance of the employment agreement's characterization of the plaintiff insurance agent as "an independent contractor and not an employee"); *see also Daughtrey v. Honeywell, Inc.*,

11

3 F.3d 1488, 1492 (11th Cir. 1993) (emphasizing that the consultant agreement stated that the plaintiff was hired as an independent contractor was "probative of the parties' intent" regarding the nature of the employment relationship).

Second, there is significant evidence that Averill himself viewed his role as that of independent contractor. He admits that when he began his relationship with Gleaner he was given the chance to work as an employee or an independent contractor. Averill admits that he chose the latter and over the course of his relationship with Gleaner, held himself out to be an independent contractor. He, furthermore, repeatedly over the course of his relationship with Gleaner reported compensation he received from Gleaner on IRS form 1099 applicable to independent contractors as opposed to the W-2 applicable to employees. *See Weary*, *supra,* 377 F.3d at 528 (noting that despite the fact that employee received benefits that he reported himself as self-employed confirmed that he was an independent contractor).

Averill's arguments that Gleaner treated him as an employee behind its closed doors are unpersuasive. Averill's primary argument in this regard is that Gleaner used bonus distributions to control the amount and method of sales. Contrary to Averill's assertions, there is nothing in the record that demonstrates Gleaner exercised any control or "penalized" him because of the methods he used to sell its products. Likewise, Averill's characterization of Gleaner's reduction in bonuses in response to Averill's increased sale of other company's products seems tenuous. The bonuses were simply incentive-based rewards that depended on the amount of Gleaner products sold, not the quantity of competing products. If Averill did not sell as many Gleaner products he would not receive as high a reward. Likewise, if Averill sold additional Gleaner products, he received increased incentives and rewards. This method is, in the effects of its operation, no different from

12

the commission-based structure by which Averill was paid and bonuses are distributed to insurance agents generally.

Likewise, while Averill may describe the office expenses and the social security bonuses as benefits – the types of benefits employers would normally provide to employees, he overlooks the fact that the benefits were conditioned on meeting a particular threshold for sales. Many of the benefits, furthermore, were not the type routinely provided to employees. Rather, they were to cover advertising, office expenses, and the payroll tax – benefits that would be more useful to independent contractors who chose their own methods of sales, managed their own offices, and hired their own employees. While the provision of health insurance benefits and the opportunity to enroll in a qualified retirement program are common in the employee-employer relationship, standing alone they do not create that status. *See id.* (concluding that two factors suggesting that plaintiff was an employee were not enough to overcome summary judgment in the face of "overwhelming evidence" to the contrary).

In addition to the parties' perceptions of themselves and the peculiar nature of the benefits, many other aspects of the relationship weigh against a finding that Averill was an employee of Gleaner. Averill regularly conducted business on behalf of other insurance companies, individually incurred expenses for advertising or other office expenses, and managed his own office, set his own hours, and hired his own employees. Averill, furthermore, was paid entirely on a commission basis, rather than a salary. That Wade, while discussing the parties relationship referred to the benefits Averill received as "employee benefits" or their period working together as a period of "employment" is not dispositive when compared with the weight of evidence presented above.

Averill argues that he must prevail because he must only prove "beyond a mere scintilla that

13

there remains a genuine issue of material fact with respect to [the claim's] essential elements." [Doc. 35]. He misstates the standard, which is that "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Averill has not met this standard.

## 2. Age Discrimination

Gleaner also argues that Ohio's age discrimination statute does not cover Averill because he was not an employee of Gleaner. The relevant section provides, in part:

> It shall be an unlawful discriminatory practice: . . . for any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

O.R.C. § 4112.02(A).

Ohio courts "apply federal law precedent interpreting Title VII of the 1964 Civil Rights Act to cases involving violations of O.R.C. Chapter 4112." *Ohio Civ. Rights Comm. v. David Richard Ingram, D.C., Inc.,* 69 Ohio St.3d 89, 95 (1994). While the Ohio Supreme Court has yet to address this question, Ohio appellate courts have consistently concluded that § 4112 does not cover independent contractors. *Berge v. Columbus Community Cable Access et al.*, 136 Ohio App. 3d 281, 299-302 (2007); see *Davis v. Johnson*, 2007 WL 4293308, *4-5 (Ohio App.) As the Sixth Circuit has noted, Title VII imposes similar restrictions. *Eyerman, supra,* 967 F.2d at 218-19.

For the reasons stated above, I find that Averill was an independent contractor, not an employee and therefore he lacks standing to assert a claim under § 4112.02(A).

## 3. Wrongful Termination of Employment and Agency

Ohio defines the tort of wrongful termination of employment and/or agency using the four

14

elements the "Perritt" test sets out:

> (1) that clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); (4) the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Painter v. Graley*, 70 Ohio St. 3d 377, 384 fn. 8 (1994) (quoting H. Perritt, *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie*?, 58 U.Cin.L.Rev. 397, 398-399 (1989)).

Under the analytic framework adopted in *Collins v. Rizkana*, 73 Ohio St.3d 65, 70 (1995), Averill must show that Gleaner's conduct violated a "clear public policy" of Ohio. He argues that Gleaner terminated their relationship because he: 1) filed suit against Gleaner; 2) complained about Wade's unspecified wrongdoing; and 3) contested Gleaner's improper termination of the GSSP. Gleaner in response presents testimony from Wade that Averill was only one of over approximately 180 agents that were fired after an internal assessment. Averill, in response, presents no evidence to support his claim that his actions motivated his termination and not routine downsizing. Rather, he reiterates the bare allegations of his complaint. Without any concrete evidence or the allegation of any specific facts, I cannot find that there is a genuine issue of material fact as to Averill's claim for wrongful termination of employment and agency.

### 4. Bad Faith Termination of Franchise

Under Michigan Law, a provision of a franchising agreement is void if "it permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause." M.C.L. § 445.1527(3). A "franchise" is defined as:

> a contract or agreement, either express or implied, whether oral or written, between two or more persons to which all of the following apply: (a) a franchisee is granted the right to engage in the business of offering, selling, or distributing goods or

15

> services under a marketing plan or system prescribed in substantial part by a
> franchiser; (b) a franchisee is granted the right to engage in the business of offering,
> selling, or distributing goods or services substantially associated with the franchiser's
> trademark, service mark, trade name, logotype, advertising, or other commercial
> symbol designating the franchisor or its affiliate; and (c) the franchisee is required
> to pay, directly or indirectly, a franchise fee.

M.C.L. § 445.1502(3).

While Averill, in his complaint alleges that Averill and associates constitutes an independent franchisee, I find that he has not provided sufficient evidence to survive summary judgment on this matter. Gleaner highlights that rather than charging Averill a fee for selling Gleaner products, Gleaner pays Averill a commission. Likewise, as the special representative agreement clearly delineates, agents are free to market Gleaner products as they see fit. Averill does not provide a response let alone any concrete evidence or specific facts in response to Gleaner's assertions.

### 5. Tortious Interference With Business Relationships

To prevail on its claim of tortious interference with business relationships, in Michigan, a plaintiff must demonstrate:

> 1) a business relationship or contract; 2) the wrongdoer's knowledge of the
> relationship or contract; 3) the wrongdoer's intentional and improper action taken to
> prevent a contract formation, procure a contractual breach, or terminate a business
> relationship; 4) a lack of privilege; and 5) resulting damages.

*Brookeside Ambulance, Inc. v. Walker Ambulance Serv.*, 112 Ohio App. 3d 150, 155-56 (1996).[10]

Averill singularly alleges that after his relationship with Gleaner was terminated, Gleaner sent Averill's former customers a letter notifying them a new agent would be servicing their

---

[10]

Courts have recognized that a former agent may have a cause of action against his former principal for tortious interference with economic advantage, despite the termination of the parties' relationship, if the insurance agent has a recognizable interest in renewal commissions. *Elwert v. Pilot Life Ins. Co.*, 77 Ohio App.3d 529, 537 (1991). Averill makes no such allegations here.

16

insurance policies with Gleaner. Averill has not set forth any facts demonstrating that, after his termination with Gleaner, he continued his business relationship with his customers with regard to Gleaner insurance products. While, under rule 56, Averill is entitled to every reasonable inference, he may not, as he has done here, simply respond to Gleaner's motion for summary judgment with a one line reiteration of his complaint. Accordingly, I find Averill has not provided evidence to establish a genuine issue of material fact.

### 6. Breach of Contract

Under Michigan law, the elements of breach of contract are: "1) parties competent to contract, 2) a proper subject matter, 3) a legal consideration, 4) mutuality of agreement, and 5) mutuality of obligation." *Thomas v. Leja*, 468 N.W.2d 58, 60 (Mich. App. 1991). It is axiomatic that, where a contract's terms are ambiguous, parol evidence may resolve the ambiguity and ascertain the intention of the parties. *Edoff v. Hecht*, 260 N.W. 93, 96 (Mich. 1935) (citation omitted).

Averill alleges that Gleaner's failure to fulfill the terms of the GSSP agreement constituted a violation of the GSSP. Gleaner, in opposition, argues that the explicit language of the agreement authorized GSSP's termination and amendment. While the agreement does reserve Gleaner's right to terminate and amend the program, it also limits these changes to those that do not affect any member's receipt of benefits.

Based upon the record before me, I can not determine whether Gleaner has shown that there is no triable issue of fact. Accordingly, I deny, without prejudice, Gleaner's motion to dismiss Averill's breach of contract claim.

### 7. Promissory Estoppel

In Michigan, to establish promissory estoppel, plaintiff must show: 1) a promise; 2) that the

promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee; 3) that in fact produced reliance or forbearance of that nature; and 4) circumstances such that the promise must be enforced if injustice is to be avoided. *Joerger v. Gordon Food Service, Inc*., 568 N.W.2d 365, 368 (Mich. App. 1997).

To determine whether a sufficient promise existed, "I must objectively examine the words and actions surrounding the transaction in question [and] the nature of the relationship between the parties and the circumstances surrounding their actions." *Geo Group v. Dep't of Corr.*, 2007 WL 1791881, *11 (Mich. App. 2007). A promise must be definite and clear to justify a finding of promissory estoppel. *McMath v. Ford Motor Co.,* 259 N.W.2d 140, 142 (Mich. App. 1977).

Averill's argument that letters summarizing Averill's accumulated savings in the GSSP contained or together could be construed to be a clear and unambiguous promise is not persuasive. The letters and accompanying statements merely confirmed the existence of a program, briefly outlined various payment plans and provided information about the amount saved under the plan. The statements included no explicit promises regarding the future of the plan or its existence. The statements, furthermore, clearly indicated that any potential future pay-outs were estimated. While the statement characterized a portion of the benefits as "100% vested," each of statements explicitly provided that the benefit statement was merely an "estimate," that the actual benefits would "vary," and that it did "not create any obligations or rights which would otherwise not exist."[11] *See Schipani v. Ford Motor Co.*, 302 N.W.2d 307, 311 (Mich. App. 1981) ("the presence of disclaimers in the

---

[11]

The GSSP, furthermore, provides that the plan shall be unfunded and any assets will be paid out of Gleaner's general fund. Averill, however, argues that it was unaware of the plan's functioning because it never received a copy of the plan. Because Gleaner has not presented any evidence or even provided a response to the contrary and every inference must be drawn in the non-moving party's favor, I will assume this to be true for the purposes of this motion.

policy handbooks may serve to negate the reliance on plaintiff's part which would be justified to either give rise to a contract or give effect to the doctrine of promissory estoppel."); *see also*, *Sneyd v. Int'l Paper Co.*, 142 F. Supp. 2d 819, 827 (E.D. Mich. 2001) (applying Michigan law, the court stated: "The Court grants summary judgments in favor of defendants as to this claim because where, as here, there is an express at-will disclaimer, a cause of action for promissory estoppel will not lie regardless of parol evidence contradicting that disclaimer.).

### 8. Fraud

To prevail on a cause of action for fraud, the plaintiff must prove:

> 1) that the charged party made a material representation; 2) that it was false; 3) that when he or she made it he or she knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; 4) that he or she made it with the intention that it should be acted [on] by the other party; 5) that the other party acted in reliance [on] it; and 6) that the other party thereby suffered injury.

*City of Novi v. Robert Adell Children's Funded Trust*, 701 N.W.2d 144, 152 n. 8 (2005).

Averill argues that Gleaner's mailings and oral statements constituted misrepresentations about the status of the GSSP and the earnings that he was due, and accordingly he relied on such by continuing to contribute funds. For the same reasons that I rejected his promissory estoppel claim (the presence of explicit disclaimers at the bottom of each statement), I reject the fraud claim.

Gleaner's alleged oral statements also do not create a genuine issue of material fact on this matter. Averill does not present any specific facts or provide any concrete evidence, instead he merely offers an affidavit with his recollections and conclusory allegations without any details as to the time, place, manner, context or general phrasing or such statements.

The record, furthermore, does not support Averill's claim that he contributed to the program in reliance on statements received from Gleaner. By definition, Gleaner sent statements to

employees already enrolled in the program. Accordingly, it is implausible that Averill could have relied on such statements in making contributions when he had already begun to make the contributions that the statements allegedly induced.

Finally, it is not clear what, if any, damage, Averill suffered as a result of Gleaner's alleged misrepresentations. After termination of the program, Gleaner returned the amount Averill had contributed to the program plus the present value of his accrued benefits.

Averill alleges, by way of damages, that he lost the opportunity to do business with other insurance companies. The fact of the matter remains that he could have continued to do business with other companies and he did. It is not clear, in any event how doing business with other companies would have been better for Averill. He does not allege that they had similar deferred compensation programs or that Averill could have garnered increased revenue from participating in such programs.

Averill does not show that Gleaner misrepresented the tangential nature of the plan, his reliance, if any, on such representations was justifiable or that he suffered any damages as a result.

### 9. Breach of Fiduciary Duty

Under Michigan law, an action for breach of fiduciary duty requires an existing fiduciary relationship. *Portage Aluminum Co. v. Kentwood Nat'l Bank*, 307 N.W.2d 761, 763 (Mich. App. 1981). The duty arises out of the relation subsisting between two persons of such a character that each must repose trust and confidence in the other and must exercise a corresponding degree of fairness and good faith. BLACK'S LAW DICTIONARY (5TH ED. 1978) 564. Damages may be obtained when [the] position of influence has been acquired and abused, or when confidence has been reposed and betrayed. *Shoaff v. Woods (In re Baldwin Trust)*, 733 N.W.2d 419, 427 (Mich.

20

App. 2007).

The gravamen of Averill's argument is that Gleaner never set aside separate funds in a separate account and instead distributed any benefits paid out from Gleaner's general fund. Thus, he argues that Gleaner violated the fiduciary duty by exposing the participants retirement benefits to a complete loss at any time.

Averill's argument is unpersuasive primarily because this alleged wrongful conduct comported with the description of the plan in the GSSP. The GSSP specifically provided that the plan would be an unfunded plan for which it would not set aside or segregate any assets, in contrast to Gleaner's separate employment plan, and that any funds paid would be paid out of Gleaner's general assets. Averill argues that Gleaner promised him that separate "matching funds" would be set aside for his program. He, however, presents no specific facts or concrete evidence of such in support. Accordingly, as Gleaner's alleged wrongful conduct was part and parcel of the parties' fiduciary relationship, assuming one existed, I am unpersuaded that conduct in accord with such an agreement constitutes a breach of fiduciary duty.

## Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT:

1. Defendant's motion for summary judgment shall be, and hereby is denied without prejudice as to plaintiff's breach of contract claim and granted as to plaintiff's remaining claims, and

2. Defendant's motion to strike plaintiff's sur-reply shall be, and hereby is denied as moot. So ordered.

21

s/James G. Carr
James G. Carr
Chief Judge